appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this honorable court are admonished to draw near and give their attention as this court is now sitting. God save the United States and this honorable court. Good morning, everyone. Good morning. I hope you're all well. And I hope you realize that we're very grateful for the way you have to do this. And if we have any kind of problem, you're not to worry because you will get your time no matter, you know, what. Okay? Okay. All right. We are here on case number one. And that is United States v. Byron Protho, number 21 of 2092. And hello, Mr. Leonard. Good morning. You may start anytime you wish. Thank you. Thank you, Judge. Mike Leonard on behalf of Appellant Brian Protho. We seek the reversal and remanding for a new trial and or remanding and dismissal based upon several significant errors which occurred at the trial of this case. And this is not a case where the errors were limited to a sole issue. In this case, they were substantial and go to the heart of the rights of Mr. Protho to receive a fair trial. And I'd like to begin by addressing the issue of the expert testimony that was the subject of the district court's pretrial ruling, specifically with regard to expert Beloga, who was tendered by the government as a fiber expert prior to trial. And the district court erred in fulfilling its gatekeeping function under Daubert with respect to that particular expert. And that particular expert had a very significant role in the trial because that expert testified at trial that she was able to identify fibers that placed the victim in the vehicle that was owned by Mr. Protho's wife and also that she was able to place fibers on Mr. Protho that she claimed came from the victim. So there were central scientific evidence that a jury would consider extremely significant in any case. And the problem with her being admitted as an expert is the district court failed in its preliminary gatekeeping function because some of the hallmarks of Daubert, as we know, are peer review and publication with respect to the particular analysis being proffered, standards that control the techniques being offered by that particular expert, those particular techniques, whether there's any sort of error rate associated with the particular technique used by that expert, and whether that particular technique is generally accepted. Now, of course, she did outline the somewhat rigorous five-step scientific theory that is used to determine whether a fiber is from the same source. Correct? Well, what the district court did, actually, if you apply her analysis, one would conclude that the expert should have been barred. If you go to the district court's findings at the docket 150 at page 6, she actually concluded that it was unclear whether this expert's methods had been subject to peer review, whether there was any known error rate, and whether they were even generally accepted within the scientific community. So if you read her reciting of the factors of Daubert and her application of them to this case, you would think that the expert would have been barred. But instead, the district court took the position that, well, it's okay, even though we don't have those hallmarks of Daubert, because defense counsel can simply cross-examine a witness at trial. But the problem with that analysis is that that's the district court's job to find first whether the testimony is reliable, and then if it's reliable, and only if it's reliable, then can it be allowed at trial. And we cited a fourth district court circuit case that really puts this nicely in context, where they say, if adversarial testing, i.e. cross-examination at trial, was the benchmark for judging scientific evidence, then the preliminary role of the judge in determining the scientific validity of a technique would never come into play. And that goes… And not have an expert, of course. I'm sorry? Mr. Prezzo did not have a defense expert, did he? He did not. Correct. Mr. Leonard, the National Academy of Sciences has recognized what the expert in this case testified to as being within, there's a report in 2009 from the National Academy of Sciences that recognizes this testimony and recognizes the scientific limitations of fiber analysis. But when I looked at the expert's testimony, I thought her testimony was very limited. She didn't testify that the fibers came from the victim's sweatshirt or anything along those lines. And by the way, I mean this… So first you've got to cross the abuse of discretion threshold, right? And then you have to cross the harmless error threshold, which I'd like you to address at some point, because it seemed to me that the evidence of your client's guilt was overwhelming, at least from the government's case. And then your client took the stand and sort of piled on to the government's evidence, at least from what I read in the transcript, from what Judge Wood clearly thought at sentencing. But in any event, her testimony, the agent's testimony is fairly limited in that regard, that there were fibers… From a cross-examination standpoint, these fibers could have come from a lot of different places, not necessarily the victim's sweatshirt. So does that matter here? I guess what I'm getting at, my question is, there is scientific recognition of this. This is not like, I don't know, this is not like wild science that this FBI agent is getting on the stand and testifying to that nobody in the I think within the scientific community. Well, Judge, I appreciate that point. And it is correct that certain fiber experts and certain techniques used by certain fiber actors has been recognized by courts as reliable. However, what didn't happen in this case is the specific technique being proffered by this expert was not shown to be reliable. So I would agree with you that yes, courts have found certain types of fiber techniques to be admissible and reliable, but the judge didn't make an individual and particularized finding in this case. And I would disagree that it was harmless error, because this was a case where identification testimony was an issue. And as the district court pointed out in one of its decisions, which is at docket 190, there were stark differences between the identification testimony given by the victim immediately after the occurrence at the time of the occurrence, and her testimony at trial. And specifically, these weren't insignificant differences. The victim did not report at the time of the crime that the perpetrator actually had a beard, which is a significant thing. The victim did not report the different marks that were on Mr. Perotho's face, particularly a very obvious large tattoo. And there was also testimony by the victim, which was completely contrary to her testimony trial versus her identification, in that one part of her identification was someone with marks and pores all over their face, and then a whole different testimony about a limited marked pores around the person's face. So this wasn't something where it was overwhelming. And I would disagree with the government on that point, because we had a gentleman who, according to the government, drove a distinct car, who allegedly was a very distinct, large, individual, African American with a very distinct tattoo and beard. Yet the government couldn't locate anybody in the world, including any acquaintance, coworker, friend, anybody, even though there was a video of this attack to say that that was Mr. Perotho. So I think the evidence was far from overwhelming. How old was the victim? I'm sorry? How old was the victim at the time she gave this statement? I believe she was 12 years old, Your Honor. No, no, she was 10. Oh, I'm sorry. She was 10 at the time of the attack and 12, I think, right? Am I wrong? The government can correct me, but I was, I was believing she was 12. I may be wrong. I'll let Mr. Kerwin address that. Yeah, all right. The other significant issues amongst them were the jury selection process, most notably the bats and challenges at trial. Now the issue with the bats and issues at trial where there were two African American jurors that are at issue, the government struck three of them. But with regard to two of them that we're talking about, 16 and 46, in both instances, the government gave what are called by the courts, demeanor-based reasons for striking them. Well, they certainly might have on the one that they can sit, you know, that they said, you know, was just falling asleep and stoic, whatever. But what about the mother of five who had this job at McDonald's at night? How, you don't think that's, I mean, that's not race-based, is it? Well, that's an interesting point, Your Honor. I really appreciate you bringing that up because that was a juror who the government didn't challenge her on that basis. The government did not raise this issue of, hey, she has a job, it might be difficult for her. Instead, they give a demeanor-based reason. But for some unexplained reason, the district court took it upon herself to question the juror about her job, which was not the reason proffered by the government. The government said a completely different reason. The government never raised this McDonald's overnight shift. And so, Your Honor, that what is significant is the judge interviewed that juror and on her own raised this McDonald's shift issue. And the juror said, no, it won't be a problem. I absolutely can serve. And so, therefore, in both instances with regard to number 16 and 46, the judge on her own raised issues that had not been raised by the government. The district court's job is to, first of all, make sure that the government proffers a race-neutral reason, which they did in both instances, which were demeanor-based. And then in both instances, remarkably, the judge relied upon things that weren't even raised. The other juror, Your Honor, the judge on her own raised the issue of age. And then the judge concluded that what the government's really doing is relying upon prejudices based upon age, which is not improper. But that wasn't an issue even raised by the government. So we can't excuse the district court's refusal to apply Batson when you take reasons proffered by the government and then make up your own. That doesn't satisfy Batson. With respect to one of the crucial issues, which was the application of Section 3509 and allowing the witness to testify by closed-circuit means. Again, this goes to the heart of Mr. Peralta's rights and his counsel's right to confront and cross-examine a witness. And the Supreme Court has recognized, and this court and the district court have repeatedly recognized, its importance. Mr. Leonard, please help me. What specifically would have been different had they been in the courtroom with the jury? Mr. Prothew's counsel was in the room with her. He was able to ask any question he would have asked in the courtroom, it seems to me. So I want to know how you would, how he was prevented from fully and effectively cross-examining her and how Mr. Prothew was prevented. Please. Sure. Judge, I think you can appreciate and probably have attended maybe the same amount or much more trials than I, but there is a stark difference between confronting... Of course I have. I don't want to make any age-based assumptions either, Judge. But the point is, we all know and appreciate there is a remarkable difference cross-examining a human being in front of a jury, in front of the defendant, and doing it from Zoom or remote means. So the point is not that he didn't get to ask the questions. It's the fact that the jury doesn't get to assess the demeanor and the credibility in front of their own eyes. They're watching from a TV screen. And as the Supreme Court has repeatedly pointed out, and I'm not saying that the victim was intentionally lying, but we quoted this in our brief, as the Supreme Court has said repeatedly, there's a big difference between lying to someone's face or testifying to someone's face and not. And the reason why this was so important, we went through all these steps to ensure that, first of all, we were supposed to ensure that the fear was satisfied, which after all the proceedings, the judge was left with the distinct impression that there was still a great ambiguity left. The key was the victim was saying, hey, I'm upset. And she tied it to the fact she was told by people associated with the government that this defendant would be wearing an orange jumpsuit. So there was this big question after the judge conducted the evidentiary hearing as to, was this victim afraid? Where had she gotten this information? And how is it impacting the fear prompt? But yet the district court failed to take the next step, which would have been real simple to either question Amani in her own presence, just the two of them, and make a record of it, do it ex parte, or do it in front of the lawyers without the presence of anybody else and with the assistance of the social worker who's there with the court. So the court failed in that respect. And the reason why it became even more significant is because the whole purpose of 3509, and you don't want to tell the jury, hey, we're doing this because this person is afraid of the defendant. Okay, we take great pains to not say that. But yet in the closing argument, full well understanding that the jury might have a problem that Amani was not able to give an in-court identification to Mr. Protho. The government goes out of its way to make a statement that Amani was essentially afraid of Mr. Protho and couldn't testify in the same room. I could not be interpreted to mean that the reason she can't testify in the courtroom is that 12-year-olds don't have the composure to do so. I think that the fair interpretation and impression upon the jury would be that, hey, there's a reason she's not here because she knows it's him and she's afraid of him, which is essentially a substitute by the government for the failure for her to give an in-court identification. And we know it would have been difficult to give an in-court identification anyways, based upon the large inconsistencies between what she told the police after the offense and what she was able to testify at trial. I know that I'm coming upon my time. I want to just briefly address and I'll address and rebuttal the instrumentality of interstate commerce. The statute does not say that the object is capable of being used as an instrumentality of interstate commerce. The statute says the object must be a means of interstate commerce or instrumentality of interstate commerce. There is nothing about this vehicle in this case that made it an instrumentality of interstate commerce. The fact that it was capable of crossing state lines or if someone wanted to use it for commercial purposes, that doesn't satisfy the plain language of the statute. And that's why the judge's instruction of the jury was error. I'd like to reserve my last two minutes. You're going to get your full three, which is what I thought of. Thank you. Okay. Hello, Mr. Kerwin. How are you today? Good, Your Honor. Thank you. You may begin. Great. Good morning and may it please the court. Brian Kerwin on behalf of the United States. Your Honors, the district court committed no error in this case. And I think I'll start with two constitutional issues raised by Mr. Leonard this morning and then turn to the other issues that we've discussed so far. And I'll start with the commerce clause just because it is so fundamental. And as the court knows in Lopez, the Supreme Court of the United States held that Congress may legislate interstate threats by regulating the instrumentality of interstate commerce. Since that decision, this court and many other courts of appeals have held that an automobile is an instrumentality of interstate commerce that Congress may prohibit the use of in the commission of crimes. And so, you know, there is no reasonable question in this case, especially where the evidence showed not only that this was an operable automobile, but that it in fact crossed state lines on the very date of What other courts are you aware of, forgive me? Your Honor, have held that an automobile is an instrumentality of interstate commerce in cases that involve an intra-state. I'm sorry. Kid. As Your Honor is very familiar, the Mandel decision in this court held that precisely. That decision cites two opinions in the Third Circuit and the Fourth Circuit, Bishop and Cobb, which are not in the federal kidnapping context, but say expressly that an automobile is an intrastate. We cite to, I think, at least two other federal kidnapping cases, excuse me, federal carjacking cases that use that same express language. There's another decision that we cite to in the brief from the Eleventh Circuit, Ballinger, that's in the church arson context. And in upholding all of those statutes under the second prong of Lopez, those courts say unequivocally that an automobile is an instrumentality of commerce that Congress may actually seems that nearly every crime now, you know, will involve the use of a cell phone or a car at some point. Well, you think there'll be any more non, I mean, will there be any more non-federal crimes by the time we're done here? Well, Your Honor, if we're looking at the use of a cell phone or the use of an automobile, which many courts of appeals have concluded constitute instrumentalities of interstate commerce, that would be a constitutional statute based on that case law. The question that would be left for the jury and which would be sort of the limiting principle on whether it's a crime is whether the defendant actually used the item either to commit or further the offense. In this case, there's no question that he did because the kidnapping actually occurred inside the automobile. You know, you may have some other crime where a kidnapping or a kidnapping occurred after an individual drove to a location or escaped from a location, and that would be a different factual question for the jury. But here, there's no question that this falls under the Lopez prong. And I just point out to Your Honor, in case it's not apparent from the record, this was not just any automobile that was used purely interstate. This was an automobile that the across the border on the very day of the kidnapping and in fact engaged in commerce at gas stations and a hospital. So I don't think it's on the facts of this case, and Judge Wood observed this in deciding to give the instruction that this car was an instrumentality of interstate commerce, as all cars are, a factual question of whether it was used to further commit the offense. Would you be kind enough to discuss that, please? Absolutely, Your Honor. A couple of factual clarifications I'd like to make based on defense counsel's argument this morning. You know, this issue came up after the parties engaged in this blind striking process that Judge Wood has in place, where the parties conclude who they're going to use their peremptory strikes on without knowing who the other side is using. There were four African-American jurors in the pool of 38. The government struck three of them, and the defendant struck one. The defendant moved under Batson to challenge initially all three of those strikes, which the judge concluded was a prima facie showing and put the burden on the rationale was. The government explained that one of the jurors had been shot in the back of the head by the police department that investigated this crime. They had sought to strike him for cause. After that explanation was offered, the defendant backed off of that particular challenge, but, you know, held tight on the other two. And that's when the government explained that one of the jurors, as Your Honor noted, worked the night shift from 11 p.m. to 7 a.m. every day. Uh, more concerning, though, was the fact that though she was a mother of five children, four of them young children, she appeared to have no emotional reaction when she was told about this crime. Uh, the government observed that her answers to virtually every question she was asked were one word. Are you really looking for people to do things like, oh, or, oh, no, or, I mean, what, you know, you have to just answer the question, you know. What is it you're saying here? Well, the record reflects, Judge, and this is, this is an inquiry that Judge Wood explored with the parties. Uh, the record shows that the government, um, sought jurors who not only were fair and impartial, but that were engaged and attentive. And with respect to the juror who they specifically noted, uh, a concern that she may be tired, um, and a concern that she, you know, may not be able to get off work. And, and Mr. Leonard points out that Judge Wood then engaged in an additional colloquy with that juror. That was after, though, the government, um, represented that the, that the night shift was a concern. And in that, Judge Rovner asked you about the stoicism rationale, which was the first rationale that the government gave. Yes, Judge, and I, I appreciate that, and Judge Wood explored that as well. And the government's representation was that, although it wanted jurors who were fair and impartial, stoicism was a concern given the fact that this is a two-week trial, and they wanted jurors who were engaged, uh, in, in. I, I raised the, the McDonald's issue in the context of that answer, only because it dovetails with it insofar as the government was concerned that that work might interfere with her ability to be alert and attentive and available, um, you know, both physically and mentally. And that's, that's very similar to the rationale that the government proposed, uh, for juror, I believe it was 46, who, although she had an advanced degree, the government observed that her eyes were closed, um, that she seemed to be trailing off in the answer she gave, and that she otherwise may not be as attentive as the, the government would like in a two-week trial involving science evidence. Um, so, the, you know, the, the defendant in, in response to those arguments at the time, pointed to that he said, well, well, they're similarly stoic, and they weren't struck, um, you know, with respect to the McDonald's juror. And, you know, there's another juror who was struck, and the judge. What, what do we make of the fact that the judge called juror number 16 back for questioning? Um, and as the government noted during trial, that wasn't the proper procedure. The judge was supposed to evaluate this, this pretext issue based on all the information she had, uh, beforehand. And does, and we do need to assess whether the district court applied the proper procedure here. And isn't the fact that she called the juror back for extra questioning evidence, that she may have been assessing the government's reasons for accuracy, as opposed to honesty, which are two different inquiries. It is an interesting point you raised, Judge, and it is one that the government protested at the time, because as you allude to, the, the reasons had been proffered, uh, and those were the reasons that the judge was to assess the credibility of, um, you know, judge would took this extra step to inquire specifically whether this, uh, work schedule would interfere, um, with service as the government worried. And in response to those questions, uh, the juror explained that she hadn't spoken to her employer. Uh, she explained that she had gotten off work that day at three in the morning, just to make me what happened. I'm asking you, what do we make of this error and what it means about how the district court improperly approached this Batson issue? I understand your honor. I think I was getting to a long way of saying that it bolstered the conclusion, uh, that she ultimately reached that the, that the reasons proffered by the government at the outset were in fact credible and not race-based. Um, you know, whether she needed to in the manner that she did, I think is irrelevant to the ultimate question, which is on the record before it, did the judge, you know, commit clear error in crediting the government's explanations as not being, um, racially motivated. And I think it's quite clear that she did. If the court has no other questions about the Batson issue, uh, I'd like to turn back to the confrontation issue. I would like, I would like to add something and, and it's, I, I don't know that it's a question, but, you know, people express their emotions in varying, uh, degrees and most people feel some level, surely, of intimidation and shyness, uh, when being wardered. Uh, I, I really, uh, uh, I don't know. Um, I'm very worried about this business of stoicism. Of course, the government wants people who think the crime before them is horrifying. Um, but, but as I say, um, you know, we can't have them, uh, carrying on in some emotional manner. Uh, I mean, I think that would poison the whole jury. Before you even got to the next person. So that I think we should really think about that. Two brief responses to that judge. One is that it's, it's the party's right to assess the attentiveness of the jurors based on their perception. And that's the purpose of the peremptory strike. Now, what we can't have are jurors who are being struck for race-based reasons. And that's the inquiry that Judge Wood was engaged in. And I emphasize again, not just that the juror was stoic, but that the government had a concern based on the one-word responses she gave, uh, and her work schedule, which together reflected a potential that she was going to be emotionally, I guess, less invested than, than the, than the government would prefer. Um, it's a very similar reason that the, the elderly juror was struck whose eyes were closed. The government was looking for folks who were, um, you know, attentive and alert. And to the extent that, um, you know, your, your honor is uncomfortable that stoicism is a, you shouldn't ever be in the calculus. It's certainly not race-based. So I'll leave it at that. Mr. Kerwin, did they, I'm just curious about the defense and their approach to this case. Did they suggest an opening statement or a closing argument or concede that the facts that the alleged, that the crime itself was pretty horrific? Um, I, I suspect they didn't challenge, I suspect they challenged that it was the defendant that did not commit the crime, not that the crime didn't occur at all, or that the facts and the underlying facts of the crime were not, um, I mean, did, you know, in other words, did the defendant at all in opening statements, sometimes you get these horrific cases or horrific facts and the defendant gets up and opening statements that we agree with the government, that there's some emotional pull to the facts or allegations in this case. But the defense is my client did not commit the crime. It was not my client, not trying to say, well, this is just run of the mill, you know, Chicago crime or something along those lines. And I, I just don't know. I didn't read the opening statement. So I'm just, I just don't know. Judge, my recollection is that it was either in the opening or in the closing, uh, defense counsel said that expressly that, um, data, they're not contesting that this crime occurred, just that it was the defendant who committed it. Mr. Cohen, I know you want to go to confrontation clause. Can you stop by restitution first, please? Um, you know, you say the district court started with this conservative estimate from Dr. Goldstein for two years of therapy. Um, but it seems to me her estimate was for something called complex PTSD, not PTSD in general. And, um, what links her estimates to the victims into individualized needs? Is there anything in the record that could have supported a finding that the victim had complex PTSD or that, that, that backs up Dr. Goldstein's estimates connects her estimates as your honor and alluding to, uh, Dr. Goldstein did not evaluate Amani specifically. She had read the transcripts of the trial of her breakdown and of the court's findings and interview. And from that, um, speculated, I concede that, um, she may have suffered from complex PTSD and judge would taking, taking that opinion under advisement and coupling it with the observations that she made of the defendant, uh, who the U S Marshall with experience in such things commented from his observations that she was in a literal state of shock. Um, he believed very likely than not, um, that she suffered some type of PSD resembling that condition and that, you know, three and a half years later at the restitution hearing, she was still undergoing therapy would tended to buttress that conclusion. Um, and given the, the age, uh, the type of crime, um, and the therapy to date, the court concluded that beyond or by preponderance of the evidence, at you know, that five times the amount of the baseline conservative estimate for someone with complex PTSD was appropriate in this case. Um, I think if anything, that was a concedingly or exceedingly conservative estimate, given Dr. Goldstein's opinion that she may need therapy for the rest of her life. Um, and the common sense inferences we can draw from a crime like this, and what it would take to make a child like this whole in the long run. By the way, she was 10. Am I correct? You're correct. Yeah. She was 10 at the time of the crime. She was 12 at the time of the, of the trial. And, and that's a good place to pivot. I think, um, it's a confrontation unless your honors would like me to address anything else first. Um, you know, as, as judge, um, Rover alluded to the, the requirements of 18 USC section 3509 were scrupulously adhered to here. And that's, that's important, I think, because as it may have been gotten lost in the shuffle and dependence argument, not only was defense counsel, um, present in person cross-examining, uh, the child live, but unlike in the Craig case, which sanctioned the use of one way closed testimony here, we had defendant's face broadcast on a screen directly in front of the defendant or of the witness. And her testimony was likewise broadcast, uh, back to the jury, back to the defendant. And the defendant himself sat with his second lawyer and communicated with that cross-examining lawyer, uh, in real time. So the procedure here was not only constitutional, but it more closely resembled live in-person cross-examination than even the procedure that the Supreme court has sanctioned in Craig. Um, you know, quickly to address, uh, two factual issues that I think were misstated by defense counsel, um, you know, on the issue of the orange jumpsuit judge would expressly considered that and said, you know, it doesn't matter what she meant by that, because it's not going to be the dispositive factor here, given what I observed, given what others observed before, during, and after her testimony, um, you know, there was no inquire of the child, uh, in person. Craig says that explicitly, the statute says it explicitly. Um, I'll turn with my remaining a minute and 20 seconds or so, uh, to the issue of, um, Ms. Beloga, who's the expert witness, the fiber comparison witness. And I just want to make clear that at the outset of, um, the, the Daubert issue, the defendant, he conceded expressly that she was qualified to conduct fiber examinations in the way that the FBI does. He did not challenge her qualifications. What he challenged was, um, the lack of a quantitative, uh, likelihood of a match, um, that fiber analysis, you know, um, to produce. And as, uh, judge Kirsch alluded to a number of times that wasn't problematic because she wasn't testifying. And her opinion was not that the five match, it was that their microscopic characteristics resemble each other such that they're consistent. But what do you do about the antecedent? What do you do about the antecedent analysis that has to take place? Um, and the district court's own finding that we, we don't, there is no evidence that, um, this thing has been tested, proven, uh, um, the, the finding that the method is reliable that has to happen first. And I see it. I'm about to run out of time. Just like to answer your question. Very important. And you may continue. Sure. So to be clear, the judge, what judge would had in front of her was a very detailed expert report as, as judge Roedner alluded to that laid out in detail this five-step process. And she had her CV, which demonstrated that she was certified and trained by the FBI to conduct this type of analysis. And if you look to, um, the microscopic ways that she's drawing these comparisons and you compare that to the actual opinion she rendered, which is that these things have similarities. Um, that's how she concluded that it, that it's a reliable method. The, the challenge by the defendant that it needed some because that's not a requirement and, you know, buttressing the conclusion that, um, that opinion is supported by the analysis is the fact that numerous of her colleagues, including herself had been qualified to testify as an expert, uh, on prior occasions, which speaks to the general acceptance of, of the science and the scientific community. And as the Barnes case from the 11th circuit notes, um, it speaks to its reliability. I want to ask you something because, um, have there not been any scientific studies that, uh, look at the reliability of fiber evidence or like there, I mean, there are, I mean, wasn't that no one proffered any or that they don't exist? Well, I think that, I think that takes us back judged to the challenge that was being watched by the defendant, which was not that this is a science that's untested or a method that isn't, you know, tried and true. It was more that the opinion shouldn't be put in front of the jury because they can't say what the likelihood of a match is between these two fibers. Um, you know, some of the district court decisions that we quote, particularly the one for the district of New Mexico, um, does cite to, to such studies. They were not put forth by the government here in large part because they weren't really responsive to the challenge that the defendant was making, which was this numerical statistical, uh, very narrow one. So unless the court has any other questions for the government, I'd ask that, uh, the court affirm the defendant's conviction and, uh, the rulings and sentence of the district court as well. Thank you very much. Um, would you, no, I would like, please, Mr. Leonard to have, uh, four minutes, please. Because, uh, we gave Mr. Kerwin an extra minute. Go ahead. Thank you, Judge. I appreciate that. Yeah. A couple points. And I know Mr. Kerwin didn't do this intentionally, but with regard to crucial Batson issue, he's mixing up facts with respect to the two jurors at issue 16 and 46. The court has to consider each one independently. Okay. I'm 16. The issue raised was stoicness. They didn't claim as they did on 46. They didn't claim on 16 that this juror was inattentive or was not paying attention. That was an argument made on 46. 16 was solely stoic, which is interesting. Mr. Leonard, Mr. Leonard, Mr. Leonard, let me interrupt you. Don't you have a major problem here in front of the court of appeals arguing that Judge Wood erred by finding that this witness was, that the government was credible, credible in saying that this witness was stoic and approving of the strike. We don't see the witness. We don't have her in front of us. We don't have a video camera of what happened in court. And we're reviewing this for clear error. So unless, unless you can point to some fact that the government lied about this, what are we supposed to do with it? Even if we, even if we agree with you, what are we supposed to do with it? Well, that's a good point judge, but there's two things that are important. One, the judge didn't uphold it on stoicness. What the judge did on 16, judge, she took judge that individual to chambers, questioned her on her own new basis, which was McDonald's overnight job, never raised by the government. And then on that new independent basis upheld the strike, not because of stoicness, but because of her own invention of what she thought might be an issue. And the second reason why the stoicness is a problem is because Batson doesn't allow you just to say, Hey, here's my demeanor based strike. And we all go home. That's not what the court say. And in this case, the record is crystal clear. And the judge made it that there were other non-African American jurors who were similarly stoic, who weren't struck. So for those two reasons, the Batson analysis was not carried out. We're not asking you to rejudge credibility. We're asking you simply to look at the record of what happened in this matter and the record that was made by the judge. With respect to the Beloga expert issue, the issue never was whether she was qualified. The question was under Daubert, was there any indicia of reliability sufficient to satisfy the judge's gatekeeping role? And in this case, all those prongs, those indicia of reliability that the Supreme Court tells us to look at, the judge admitted none of them had been satisfied in her written opinion. And that meant that the reliability could be anywhere from zero or 1%. Nobody knew. And this judge even said in her written opinion that they had not even said that her particular technique used in this case had been peer reviewed or subject to peer review. So the question again is not whether a different expert using a different fiber analysis in a different district court was qualified. It's regarding to this one. And then finally, in response to Judge Rovner's question, this would be the first court in the country, this court, to find that a car is per se an instrumentality of interstate commerce for the federal kidnapping statute. The only other court in the country that ever found that is the district court in the Northern District of Texas in Mitchell, which gave no reason whatsoever for its analysis. So this would be the first court to so find. Mr. Leonard, can you address restitution because you raise it? What should the district court have done differently there in your view? Well, it really wasn't the failure of the district court. It was the failure of the government to come forward with an expert who had some ability to testify. I mean, Dr. Goldstein, respectively, admitted that her testimony was entirely speculative, meaning she had never seen, talked to the victim, and she had no basis to give an opinion about this particular individual. So it's pretty unique when you have an expert admitting that their testimony is based upon speculation. So it wasn't so much a failure of the district court. It was the government to call a witness, including possibly a treating physician or a counselor who had seen this victim who could have provided admissible testimony. I think my time is up. I appreciate you giving me the extra time. Anything you want to add real fast or not? I think I'm good. If you have any further questions, I'd be happy to answer them. Anyone have any further questions? No? Thank you both very, very much. I want to particularly thank you, Mr. Leonard, because you were appointed and the court is most appreciative for the fine job you've done for your client. And of course, Mr. Government for the fine job you do for the government. So there we go. Take care of yourself and bye bye. Thank you.